IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EHT US1, Inc., *et al.*,<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 21-10036 (KBO)<br><br>(Jointly Administered) |
| Evolution Hospitality, LLC and Interstate Management Company, LLC,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>Alan Tantleff, in his capacity as Liquidating Trustee,<br><br>　　　　　　　Defendant. | Adv. Pro. No. 22-50264 (KBO) |

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS COMPLAINT
FOR DECLARATORY RELIEF PURSUANT TO RULE 7001**

Evolution Hospitality, LLC ("**Evolution Hospitality**") and Interstate Management Company, LLC ("**Interstate**" and, collectively, "**Evolution**"), by and through their undersigned counsel, hereby file this Response (the "**Response**") in opposition to Defendant's Motion to Dismiss Complaint for Declaratory Relief Pursuant to Rule 7001 (Adv. P. Dkt. No. 4) and the brief filed by Defendant Alan Tantleff, solely in his capacity as Liquidating Trustee ("**Defendant**" or the "**Liquidating Trustee**"), in support of the motion (Adv. P. Dkt. No. 5) (collectively referred to herein as the "**Motion to Dismiss**"), and in support thereof, state as follows:

**INTRODUCTION[1]**

The Motion to Dismiss presents an unseemly reversal of roles wherein the Liquidating Trustee acts as a defender of the fraudulent enterprise constructed by Woods and Wu. The

---

[1] References to "ECF No." are pleadings filed in the main bankruptcy case (Case No. 21-10036 (KBO)). References to "Adv. P. Dkt. No." are pleadings filed in this adversary proceeding. Capitalized terms used herein and not otherwise

Complaint sets forth in detail how Woods and Wu controlled both the Urban Commons Lessees and the Debtor Propcos from the same office, all the while disregarding corporate distinctions.

In detailing the financial shenanigans of Woods and Wu, during the eleven-month period between the May 2019 IPO and the April 2020 appointment of Alan Tantleff as Chief Restructuring Offer of Eagle Hospitality Investment Group, the allegations contained in the Complaint are virtually harmonious with the Declaration of Alan Tantleff. (*See* ECF No. 13 (Declaration of Alan Tantleff, Chief Restructuring Officer of Eagle Hospitality Group, In Support of Debtors' Chapter 11 Petitions and First Day), referred to herein as the "**Declaration**".) That is why it is disturbing that the Motion to Dismiss filed on behalf of Alan Tantleff, in his capacity as Liquidating Trustee, walks back many of the very statements contained in his Declaration.

While the Complaint contains more than sufficient allegations on its own to survive the applicable standard for a motion to dismiss, the Declaration bolsters the key elements necessary to support a single economic entity test. There are many examples, but paragraph 55 of the Declaration by itself admits the allegations forming the bulwark of a fulsome alter ego claim:

> Prior to April 2020, Woods and Wu were authorized signatories for both the Propcos and Master Lessees, and, in many instances, were the signatories on both sides of key agreements which Woods and/or Wu literally signed twice: first for the Propco, second for the Master Lessee. During this period, Woods and Wu used their ability to assert control over the Propcos in their business dealings with the Woods/Wu-owned Master Lessees to benefit the Master Lessees (or themselves) at the expense of the Propcos and the Eagle Hospitality Group.

Another inexplicable theme of the Motion to Dismiss is that the Complaint alleges insufficient or conclusory facts. Judge Sontchi opined on this very notion in the context of the Debtors' objection to Evolution's claim: "[T]he Court is unable to rule on this record because the

---

defined shall have the meanings given to them in the Complaint for Declaratory Relief Pursuant to Rule 7001 (Adv. P. Dkt. No. 1) (the "**Complaint**").

equitable claims are question of fact and discovery is required." (*See* ECF No. 2129 (Opinion), referred to herein as the "**Opinion**", at 22–23.) More disappointing, however, is that Mr. Tantleff himself promised to "continue to investigate the full magnitude of the Master Lessees' failures to pay operating expenses and the claims of trade creditors and taxing authorities arising therefrom, as discussed above." (Decl., ¶ 108.) During the salient time period, the Evolution Managed Hotels generated revenues of $91,508,099. From those funds, the Debtor Propcos received millions of dollars in rent, to which they were not entitled until first Evolution and all hotel operating expenses were paid. An unstated premise of the Motion to Dismiss is that the only misappropriation this Court should consider is one which harmed the Debtor Propcos. Misappropriations which benefited the Debtor Propcos should be ignored.

Despite his promises to the contrary, the Liquidating Trustee has not accounted for where the $91.5 million went (other than improperly paid rent). Until these monies are properly accounted for, the nature and extent of the fraudulent enterprise will not be known. All this begs the questions as to whether a forensic accounting has been performed, and if not, why not? For these reasons, it would be both imprudent and injudicious to dismiss the Complaint.

## APPLICABLE LEGAL STANDARD

1. Under Federal Rule of Civil Procedure 8 (applicable pursuant to Federal Rule of Bankruptcy Procedure 7008), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *In re Grosso*, 512 B.R. 768, 770 (Bankr. D. Del. 2014) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

2. In deciding a motion to dismiss, the court "must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff." *In re Uni-*

*Marts, LLC*, 404 B.R. 767, 783 (Bankr. D. Del. 2009) (citation omitted). The court "do[es] not inquire whether [the] plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is entitled to offer evidence to support his or her claims." *Borough of Moosic v. Darwin Nat'l. Assurance Co.*, 556 F. App'x 92, 95 (3d Cir. 2014) (citation omitted); *see also Phillips v. Cnty of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted) ("[O]n a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.").

3.      Further, the court must read the factual allegations "as a whole and in context," *see Howard Hess Dental Laboratories. Inc. v. Densply Intern. Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (citations omitted), and must "draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *See Phillips*, 515 F.3d at 228; *accord Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 174 (3d Cir. 2015) (citation omitted). The moving party must show that the plaintiff has failed to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that those elements exist." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).

4.      Thus, a motion to dismiss must be denied if the proffered grounds for dismissal require the court to "draw inferences against the [plaintiff]." *See Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition Inc.)*, No. 12–12071(KG), 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015); *see also Phillips*, 515 F.3d at 233 (citation omitted) (motion to dismiss must be denied if "under any reasonable reading of the complaint, the plaintiff may be entitled to relief").

## **PROCEDURAL POSTURE AND RELEVANT FACTS**

5.      Evolution stands by the adequacy of those facts set forth in the Complaint. It should be noted that this adversary proceeding stems from this Court's preliminary adjudication of Evolution's Proofs of Claim. (*See* Opinion.) In the Opinion, Judge Sontchi restated an uncontested premise, *i.e.*, there was no contractual privity between Debtors and Evolution, thus any claim for breach of contract against the Debtors was precluded. (Opinion at 22.) Rather, Evolution's legal claim hinges on the notions that application of alter ego is appropriate and that barring Evolution's claims would allow the Debtor Propcos to be unjustly enriched. These issues were briefed by both sides in the context of a claims dispute with reference made to relevant law and detailed factual allegations. (*See* ECF No. 1449 (Omnibus Response of Evolution Hospitality, LLC and Interstate Management Company, LLC to Debtors' Objection to Proofs of Claim).)

6.      After considering Evolution's contentions and claims, the Court directed Evolution to bring its equitable claims through an adversary action because "Evolution's equitable claims are questions of fact and there has been no discovery to flush out the facts needed to decide the question." (Opinion at 22.) As set forth in the Opinion, the Court was unable at the time to rule on the record before it because "equitable claims are question of fact and discovery is required." (*Id.* at 23.) Accordingly, the Court directed Evolution "to seek relief of its equitable claims, if any, through an adversary action." (*Id.*)

7.      Consistent with the Court's admonition, the Complaint has set forth a valid basis for equitable relief. Evolution relies upon the facts set forth therein. *See Howard Hess Dental Laboratories. Inc.*, 602 F.3d at 256 (citations omitted). Despite Judge Sontchi's statement that equitable claims are questions of fact, therefore "discovery is required," the Liquidating Trustee filed a Motion to Dismiss attempting to prevent discovery while simultaneously asserting the

Complaint failed to allege sufficient information. In addition, the Motion to Dismiss asked the Court to improperly draw inferences in favor of the Liquidating Trustee. *See Phillips*, 515 F.3d at 228; *accord Kaymark v. Bank of Am., N.A.*, 783 F.3d at 174 (citation omitted).

### LIQUIDATING TRUSTEE'S MISUSE OF FACT SECTION

8. The Motion to Dismiss pays lip service to "assume[] the facts in the Complaint to be true," in a footnote to its section titled "Relevant Facts." Reference to extraneous facts and documents for purposes of raising affirmative defenses are clearly outside the purview of a Rule 12(b)(6) motion. This Response will not address each and every one. However, the misplaced reference in the "Relevant Facts" section that "there is no dispute that the Debtor Propcos were released from post-assignment contractual liability under the respective HMAs," (Brief in Support of Mot. to Dismiss at 7), takes liberties that must be contradicted. There is no release section in the HMAs, and no release was ever knowingly and voluntarily granted by Evolution. To the extent the Liquidating Trustee seeks to raise release as a defense, this underscores the need for discovery regarding said affirmative defense. Placing this meritless defense in a "Relevant Fact" section, then characterizing it as undisputed, raises inferences about the legitimacy of the Liquidating Trustee's position.

### LEGAL ARGUMENT

**I.  The Corporate Veil / Alter Ego Count is Adequately Plead**

9. Count I of the Complaint (Alter Ego / Veil Piercing) alleges that Evolution's claims summarized in the Proofs of Claims should be allowed against the appropriate Debtor Propcos because the entire enterprise controlled by Woods and Wu was operated as a single fraudulent enterprise. $91.5 million generated by Evolution's management of various hotels was siphoned off through the myriad of companies and bank accounts controlled by Woods and Wu in violation of principles of corporate separateness. In effect, the Debtor Propcos were alter egos of the Urban

Commons Lessees. No outsider, including the Liquidating Trustee, has been able to discern what hat Woods or Wu was wearing when monies were moved from one entity to the next in violation of both the corporate structure and contractual arrangements presented to Evolution. The facts alleged in the Complaint are precisely the type of exceptional circumstances cited in applicable case law as support for disregarding the corporate veil.

### A. Standard for Alter Ego / Veil Piercing

10. In addressing certain relationships, such as that of parent and subsidiary or other affiliated entities, the veil piercing analysis conducted by a court is often described as an "alter ego" analysis because, in substance, the court examines whether the entities are indeed legally distinct from one another. In those circumstances, "the corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent," with the general test being whether the two entities "operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *See, e.g., Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, No. 8758, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990); *Mason v. Network of Wilmington, Inc.*, No. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005); *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008); *In re Opus East, LLC*, 528 B.R. 30, 57 (Bankr. D. Del. 2015). The purpose of allowing the corporate veil to be pierced is to hold the party actually responsible for the inequitable conduct as accountable, and further, to prevent that party from using another corporate entity to shield itself from liability. *See Official Comm. of Unsecured Creditors v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) (citations omitted) (applying Delaware law).

11. The degree of control required to pierce the veil is "exclusive domination and control . . . to the point that [the subsidiary] no longer ha[s] legal or independent significance of [its] own." *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, Del. Ch., C.A. No. 11514, Allen,

C., *slip op.* at 26, 1992 WL 127567, at *11 (May 28, 1992). Further, the decision is fact intensive depending on the case before the court. *In re Opus East, LLC*, 528 B.R. at 58.

12. The Liquidating Trustee puts forth two arguments in the Motion to Dismiss to support its assertion that the Complaint fails to plead a viable claim for alter ego/veil piercing. First, the Liquidating Trustee argues that Evolution has not pled facts sufficient to establish that the Urban Commons Lessees and Debtor Propcos operated as a single economic entity. Second, the Liquidating Trustee asserts that the Complaint does not sufficiently allege fraud or injustice by the Liquidating Trustee. Neither of these arguments has any merit. For the reasons stated below, the Complaint pleads more than enough factual allegations for its alter ego/veil piercing claim, when reviewed in the light most favorable to the Plaintiff.

    **B.**    ***The Complaint Sufficiently Pleads Facts to Establish that the Urban Commons Lessees and Debtor Propcos Operated as a Single Economic Entity under the EHT-REIT Enterprise***

13. In Delaware, courts apply a multi-factor test to determine whether a "single economic entity" exists sufficient to satisfy the first prong of the elements required to pierce the corporate veil. *Trevino v. Merscorp. Inc.*, 583 F. Supp. 2d 521, 528–29 (D. Del. 2008) (citing *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981)). The factors are: (1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders. *In Re Broadstripe, LLC*, 444 B.R. 51, 102 (Bankr. D. Del. 2010). As the Liquidating Trustee acknowledges in the Motion to Dismiss, not all factors are required to be pled and no single factor is dispositive—only "some combination is required." (Mot. to Dismiss, ¶ 11.) *See also In Re Broadstripe, LLC*, 444 B.R. at 102; *Blair v. Infineon Tech. AG*, 720 F. Supp. 462, 472–73 (D. Del. 2010) (stating that the factors

"only outline useful considerations for the court" and the absence of certain factors "may be sufficiently outweighed by the other considerations when balanced on whole").

### (i) Undercapitalization

14. Under Delaware law, "undercapitalization" or "unreasonably small capital" is conceptually distinct from insolvency. A debtor is undercapitalized if it cannot generate enough cash flow to sustain operations at the time of the obligation under a reasonable foreseeability standard. *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 552–53 (Bankr. D. Del. 2012).

15. The Complaint is replete with allegations of Woods and Wu siphoning funds away from the operating hotels, leaving them with inadequate liquidity to pay operating expenses. Numerous allegations in the Complaint specify the means by which the Urban Commons Lessees were left with inadequate capital. (*See* Compl., ¶¶ 52–57, 95–97 and 99–101.)

16. Ironically, it is the Liquidating Trustee whose responsibility included identifying both how much money was misappropriated through this fraudulent scheme and where the money went. (*See* Decl., ¶¶ 76–79, and 108.)  Thus, the Motion to Dismiss should be construed as an attempt to avoid sharing information in discovery that currently resides exclusively with Woods, Wu and the Liquidating Trustee. While Woods and Wu are asserting their Fifth Amendment rights, the Liquidating Trustee should not ask this Court to dismiss equitable claims without any disclosure about what happened to the $91.5 million. Evolution intends to subpoena bank records from the fraudulent enterprises, either from the Liquidating Trustee or from Bank of America.

17. The systemic undercapitalization and misapplication of funds persisted despite multiple demands for compliance and subsequent default notices from Evolution. (Compl. ¶¶ 65–66.) These failures, together with the corporate facades put in place by Woods and Wu, led to a sustained period of undercapitalization at the hotels—predating the COVID-19 pandemic and eventually resulting in the closure of the Evolution Managed Hotels. (Compl., ¶ 66.)

### (ii) Failure to Observe Corporate Formalities

18. Numerous allegations in the Complaint establish a failure to observe corporate formalities. As discussed above, siphoning money from one related entity and moving it to another reflects failure to follow corporate formalities as it manifests a lack of respect for corporate separateness of those entities under the concurrent control of Woods and Wu. (*See, e.g.,* Compl., ¶¶ 52–54.) In addition, the corporate formalities to which the Urban Commons Lessees agreed included that all revenues generated by the Evolution Managed Hotels would be deposited into bank accounts controlled by Evolution. Even though such bank accounts were opened, the Urban Commons Lessees failed to effectuate a transfer of the credit card receipts into the Evolution accounts. (*See* Compl., ¶¶ 86–88 and 95–97.)

19. Other examples of Woods and Wu ignoring the boundaries of corporate separateness include:

- The simultaneous direct or indirect control of Woods and Wu over the operations of EH-REIT, the Debtor Propcos and the Urban Commons Lessees (Compl., ¶¶ 32–37),

- The execution and delivery of key agreements (including the Master Leases) by Woods and Wu on behalf of both the lessor and the lessee (Compl., ¶ 39),

- The Debtor Propcos and the Urban Commons Lessees shared office space and personnel (Compl., ¶ 40),

- The Urban Commons Lessees shared senior personnel (Compl., ¶¶ 35, 41–47), and

- Woods and Wu executed a PPP loan application for the Queen Mary Hotel on behalf of Debtor Urban Commons Queensway, LLC ("UCQ") after being removed as officers of UCQ using triple insider status (Compl., ¶¶ 61–62).

### (iii) Nonpayment of Dividends

20. In paragraphs 54 and 56 of his Declaration, the Liquidating Trustee (as the Chief Restructuring Officer) cites even more examples of the inherently conflicting interests between

the Debtor Propcos and the Urban Commons Lessees. Unlike Evolution, the Liquidating Trustee had access to the books and records of these companies as the Chief Restructuring Officer and then subsequently as the Liquidating Trustee. In contrast, Evolution thus far has only had access to public documents.

21. Another factor identified that reflects a lack of corporate separateness by these entities is contained in paragraph 98 of the Declaration, wherein Mr. Tantleff states, "the Special Committee retained separate counsel to represent Eagle Hospitality Group, a key decision given that previously *the Woods/Wu-owned entities and the Eagle Hospitality Group entities had all been represented by the same counsel*." (Decl., ¶ 98 (emphasis added).)

22. Unlike the Liquidating Trustee, Evolution has no books and records of the entities that engaged in the fraudulent enterprise. As a result, Evolution does not presently have knowledge about nonpayment of dividends.

### (iv) The Insolvency of the Debtor Corporation at the Time

23. The Motion to Dismiss simply states that the Complaint sets forth no allegations of insolvency. The Complaint clearly alleges that the defaults resulted in an inability to pay the Hotels' operating expenses, and the downturn caused by the COVID pandemic eventually resulted in Evolution closing the Evolution Managed Hotels on or around May 7, 2020, and the closure of the Interstate Managed Hotel on May 26, 2020. (Compl., ¶ 66.)

24. This is not a controvertible issue, as these entities have proven to be woefully insolvent. In addition, a bankruptcy court may take judicial notice of the docket entries in a case and the contents of the bankruptcy schedules to determine the timing and status of case events, as well as facts not reasonably in dispute. *See In re Paolino*, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa., Jan. 11, 1991) (*citing* Fed. R. Evid. 201, as incorporated by Fed. R. Bankr. P. 9017). Further, a bankruptcy court may take judicial notice of its own records, as well as the records of

other courts in related matters. *In re Meltzer*, 516 B.R. 504, 506 n.2 (Bankr. N.D. Ill. 2014); *SG & Co. Northeast, LLC v. Good*, 461 B.R. 532, 535 n.3 (Bankr. N.D. Ill. 2011).

    **(v) Siphoning of the Corporation's Funds by the Dominant Stockholder**

25. Again, this is not an issue subject to controversy. The Complaint, in paragraph 90(e) alleges:

> Substantial sums of money were siphoned away from the Hotels to avoid paying creditors of the Hotels, while the Debtor Propcos collected rent, leaving the Hotels under capitalized and unable to pay operating expenses, including amounts advanced by or owed to Evolution.

26. The Complaint is descriptive concerning the control exercised over the related entities by Woods and Wu, the dominant stakeholders. (*See e.g.*, Compl., ¶¶ 22–28, 32–38, 44–45, 52–54 and 87–88.)

    **(vi) Absence of Corporate Records**

27. The Motion to Dismiss states that the Complaint sets forth no allegations of absence of corporate records. In the absence of discovery, Evolution has no means to know the status of corporate records, although this knowledge already resides with the Liquidating Trustee. (*See* Decl., ¶ 2.) In any event, this factor is not dispositive and courts put little emphasis on it when analyzed because it is generally considered coupled with other factors in the analysis, such as the failure to observe corporate formalities. *See e.g.*, *In re Autobacs*, 473 B.R. at 556.

    **(vii) Corporation is Merely a Façade for the Operations of the Dominant Stockholder(s)**

28. Largely, these issues have been previously covered. The Motion to Dismiss attempts to define this element as tied to the IPO. (Mot. to Dismiss, ¶ 30.) Whether the IPO was designed as an instrumentality to commit fraud or whether the corporate structure created by the IPO was abused matters not with regard to meeting this element. The allegations in the Complaint are to be taken as true under the 12(b)(6) standard. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224,

231 (3d Cir. 2008). Simply stating that none of the Complaint allegations are true because the Prospectus suggests that the 2019 IPO had a legitimate purpose is unfounded.

29. Under Delaware precedent, a parent corporation that exercises significant control over the operations and finances of its subsidiaries can lead to an inference that a façade has been created and weighs in favor of veil piercing. *See In re Autobacs*, 473 B.R. at 559 (*citing Infineon Tech. AG*, 720 F. Supp. 2d at 472 (holding that allegations gave rise to inference that defendants created façade by exercising significant control of subsidiaries' operations, finances and ultimate decision to close portions of the business)). Examples include parent entities stepping in to conduct operations on behalf of their subsidiaries, coordinated communication and work-out efforts with a parent company's lender, granting guarantees by and for the benefit of purportedly separate and independent entities and contemporaneous employment and compensation of a senior executive responsible for managing the relationship between the debtor and the subsidiary. Such are the circumstances here.

30. Here, the vertically integrated façade was created by both a corporate structure which was ignored and contractual relationships within that corporate structure that were never followed. The means by which both the Urban Commons Lessees and Debtor Propcos defrauded Evolution prior to the appointment of the Chief Restructuring Officer are alleged with particularity, among other allegations. (Compl., ¶¶ 39–46 and 85–89.)  All of these allegations underscore how Woods and Wu raided the coffers of the enterprise, favoring the Debtor Propcos with millions of dollars of rent payments under the guise of a legitimate vertically integrated hospitality enterprise.

C. *Evolution Has Suffered Unfairness and Injustice.*

31. In addition to operating as a single economic unit, Evolution prevails on its veil piercing theory, because it can demonstrate the presence of an element of unfairness or injustice. *In re Opus East, LLC*, 528 B.R. at 57. The burden is to prove that the Debtors used the corporate

form to defeat the ends of justice, to perpetuate fraud, to accomplish a crime, or otherwise evade the law. *Id.* at 64–65.

32.     The Complaint sets forth multiple occasions where Woods, Wu, the Urbans Commons Lessees and the Debtor Propcos (while controlled by Woods and Wu) likely committed fraud. Yet, proof of fraud is not necessary. *See In re Sunbeam Corp.*, 284 B.R. at 365. The purpose of allowing the corporate veil to be pierced is to hold the party actually responsible for the inequitable conduct accountable, and further, to prevent that party from using another corporate entity to shield itself from liability. *Id.* As set forth above, the Complaint pleads sufficient factual allegations to support that there was an injustice by virtue of Woods and Wu's "abuse of the corporate form" and "elaborate shell game." *See id.* Disallowing Evolution's Proofs of Claim would in essence bless the creation of a leasehold structure where Woods and Wu caused the Debtor Propcos to enjoy the fruits of the services provided by Evolution while avoiding any responsibility for those liabilities.

## II.     The Count for Unjust Enrichment is Adequately Pled and Does Not Fail as a Matter of Law

33.     To establish a claim for unjust enrichment, a plaintiff must prove five elements:  (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  Here, all such elements are pled in the Complaint.

34.     As set forth in paragraphs 92–103 of the Complaint, Evolution managed seven hotels owned in fee title by Debtor Propcos between May 2019 and April 2020, when the Chief Restructuring Officer displaced Woods and Wu. Paragraphs 39–56 of the Complaint detail upon the occurrence of the IPO, the business relationship was restructured such that the HMAs were assigned to the Urban Commons Lessees.

14

35. The HMAs expressly required all monies generated by each Evolution Managed Hotel be deposited into an "Operating Account" with Evolution "retaining exclusive signing authority for distribution of the funds contained in the Operating Account." (Compl., ¶ 22.) Evolution was "authorized to pay all Operating Expenses out of Operating Funds, including, without limitation expense for any and all compensation and other benefits paid to Hotel employees, and any and all fees, costs and reimbursements. . . ." (Compl., ¶ 23.) In essence, the credit card receipts were to be paid into the Evolution bank account from which Evolution would pay all operating expenses, including its management fees. The remainder would be remitted to the Urban Commons Lessees, which would then pay rent to the Debtor Propcos.

36. The Debtor Propcos were contractually bound to receive rent sales from proceeds net operating costs. Instead, between May 2019 and January 1, 2020, the Debtor Propcos were paid millions of dollars of rent out of the <u>gross</u> hotel revenues. Woods and Wu had exclusive control of both the Urban Commons Lessees and Debtor Propcos at this time. Thus, the Debtor Propcos are construed to have actual notice that their rent was paid in direct violation of the contracts governing this enterprise.

37. The Motion to Dismiss attempts to define this unjust enrichment claim in a self-serving manner as a breach of HMA claim. As set forth in paragraphs 100 to 101 of the Complaint, Evolution expended $5.8 million advancing employee compensation, benefits, insurance and management fees to the hotels it managed during this tumultuous period, keeping the hotels open and preserving their value. Thus, to the extent the Debtor Propcos received rent during this nine-month period from revenues wrongfully diverted from Evolution, the Debtor Propcos have been enriched at Evolution's expense. Unjust enrichment is an equitable remedy where privity of contract does not exist.

### III. Liquidating Trustee's General Objection to Count III (Claim Allowance) is Without Merit

38. The only objection that the Liquidating Trustee raises with respect to Count III (Claim Allowance) is that it is premised on the success of Counts I and II, and because those counts should be dismissed, Count III should be dismissed with prejudice. For the reasons set forth above, Counts I and II are adequately pled and are sustained as a matter of law. Accordingly, the Liquidating Trustee's argument with respect to Count III is without merit.

### IV. In the Alternative, Leave to Re-Plead Should be Granted

39. Should the Court conclude that any of the claims are not adequately pled, Evolution respectfully requests leave to re-plead. Rule 15(a) of the Federal Rules of Civil Procedure, applicable to this adversary proceeding pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure, provides that "when justice so requires," leave to amend should be "freely granted." *See* Fed. R. Civ. P. 15(a)(2). As the Third Circuit has explained, courts should use "strong liberality" in considering whether to grant leave to amend. *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (citations omitted). Leave to amend should not be denied absent undue delay, bad faith, undue prejudice to the non-movant, or futility, none of which are present here. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

## CONCLUSION

WHEREFORE, Evolution requests that the Court enter an order denying the Motion to Dismiss and grant such further relief as it deems just and proper.

Dated: June 27, 2022

**COZEN O'CONNOR**

*/s/ Thomas M Horan*
Thomas M. Horan (DE Bar No. 4641)
1201 N. Market St., Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2045
E-mail: thoran@cozen.com

-and-

Steven E. Abelman (admitted *pro hac vice*)
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Telephone: (303) 223-1100
E-mail: sabelman@bhfs.com

*Counsel to Evolution Hospitality, LLC and Interstate Management Company, LLC*